UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHANA PAYNE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 1:07-cv-0981-DFH-JMS |
| STATE STUDENT ASSISTANCE | ) |
| COMMISSION, ALLISON KNOX, | ) |
| and SEANNA MURPHY, | ) |
| | ) |
| Defendants. | ) |

ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Shana Payne worked for Indiana's State Student Assistance Commission ("SSAC") from September 19, 2005, until her employment was terminated on September 15, 2006. She brings numerous claims against SSAC and managers Allison Knox and Seanna Murphy in their official capacities under the Americans with Disabilities Act (42 U.S.C. § 12112, *et seq.*), the Rehabilitation Act (29 U.S.C. § 794, *et seq.*), Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, *et seq.*), the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Pregnancy Discrimination Act (42 U.S.C. § 2000e(k)), the Family and Medical Leave Act (29 U.S.C. § 2601, *et seq.*), the Civil Rights Act of 1871 (42 U.S.C. § 1983), Title VI of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000d, *et seq.*), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681, *et seq.*).

The defendants have moved for summary judgment on all claims.  Payne has cross-moved for summary judgment on her FMLA claim.  Although whether SSAC is a state agency (and whether Knox and Murphy were state officials at the time of their actions) is a question that cannot be resolved as a matter of law based on the submissions of the parties, each of Payne's claims fails on the merits.  As explained below, her motion for summary judgment on her FMLA claim is denied and the defendants' motion for summary judgment on all claims is granted.

### Standard for Cross Motions for Summary Judgment

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court's ruling on a motion for summary judgment is akin to that on a motion for a directed verdict.  The question for the court in both is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255.  However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record.  *Id.* at 251-52.

The fact that both sides have filed motions for summary judgment does not alter the applicable standard.   The court must consider each motion independently and must deny both motions if there is a genuine issue of material fact.  *E.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Harms v. Laboratory Corp. of America*, 155 F. Supp. 2d 891, 905-06 (N.D. Ill. 2001).  Thus, in considering cross-motions for summary judgment, the court must consider the evidence through two lenses.  When considering the defendants' motion for summary judgment, which consumes the bulk of the court's entry, the court must give the plaintiff the benefit of all conflicts in the evidence and the benefit of all reasonable inferences that might be drawn from the evidence in her favor.  When considering Payne's cross-motion on her FMLA claim, the roles are reversed.

*Facts for Summary Judgment*

Plaintiff Shana Payne accepted an offer to work for SSAC in mid-August 2005.  Her first day of work for the SSAC was September 19, 2005.  Payne Aff. ¶¶ 3, 10; Heflin Aff. ¶ 4; Payne Ex. C.[1]  Her title was "Clerk Assistant 1," and she was responsible for processing 21st Century Scholar's Program scholarship applications and affirmation forms and for performing general administrative duties in the office.  Heflin Aff. ¶¶ 6-7.  Payne's supervisor was Allison Knox, and Knox's supervisor was Seanna Murphy, who was Division Director of the 21st Century Scholar's Program.  Heflin Aff. ¶ 10.  Payne's scheduled work hours were from 8:30 a.m. until 5:30 p.m.  Heflin Aff. ¶ 8; Payne Dep. 27.

On November 9, 2005, Payne received a performance review under which she was marked as "meeting expectations" in every category, but her supervisor noted that she "needed to work on punctuality and consistent attendance."  Payne Dep. 26; Payne Dep. Ex. 6.  Payne's February 2006 performance review did not reflect any attendance problems.  Payne Ex. B.

---

[1]Payne asserts that she also "served" SSAC for nine months as part of a work-study program nine years earlier.  Pl. Br. 3.  Apparently, Payne applied for work study financial assistance through SSAC in 1996 and, from August 1996 to May 1997 was assigned to work at the ophthalmology library at Indiana University-Purdue University Indianapolis.  Payne Aff. ¶ 12.  As discussed below, however, she does not support her assertion that her work study time should count towards her FMLA eligibility with competent factual evidence.

In March 2006, Payne informed Knox and Murphy that she was pregnant. Payne Aff. ¶ 20.  Payne, along with her entire work group, was placed on a 30-day probation on March 20, 2006 for taking time off without pre-authorization.  Payne Dep. 31.  Payne believed that the discipline did not apply to her individually but that she was simply included in the group.  Payne Aff. ¶ 16.  Because she missed work on June 19, June 20, June 29, June 30, and July 3, and left work early on July 5, Murphy and Knox asked Payne to provide doctor's notes for the unauthorized absences.  Payne Dep. 33, Payne Dep. Ex. 9.[2]  Each of these absences was related to prenatal care and/or morning sickness.  Payne Aff. ¶¶ 17. The parties dispute whether Payne provided the requested information about each of the absences.  Heflin Aff. ¶ 19; Payne Aff. ¶ 17.  On July 10, 2006, Payne was counseled for "excessive absenteeism and periods of unauthorized leave from work."  Payne Dep. Ex. 10.  Her written counseling specified that only sick leave, vacation, personal leave, and FMLA hours were considered authorized absences and that when returning to work from an unauthorized absence, employees were required to bring a doctor's note.  Payne Dep. Ex. 10.

On July 19, 2006, Payne left work four hours early without pre-authorizing time off.  As a result, on July 20, 2006, she was placed on probation and signed the disciplinary warning form.  Payne Dep. Ex. 11.  She was advised that she was

---

[2]Payne also missed work from April 17 through May 6 for carpal tunnel surgery.  Payne Aff. ¶ 16.  Payne did not have vacation, sick, or personal time off available.  SSAC authorized the absences as vacation leave, sick leave, and time off without pay.  Payne Aff. ¶ 16; Payne Ex. C.

excused for medical appointments but that she needed to supply Knox with information about her appointments and notes from her doctor.  Payne Dep. Ex. 12.  Knox also agreed to adjust Payne's schedule to allow her to be out of the office for doctor's appointments and morning sickness so long as she made the time up. Payne Aff. ¶ 17; Payne Dep. Ex. 12.  Payne testified that she "was told that so long as my appointments were on my desktop calendar and the hardcopy calendar maintained on the wall of [SSAC's] office, that all time taken by me to attend to prenatal care would be excused, and not unauthorized.  Thereafter, I placed all prenatal care appointments on both calendars.  I was informed that my supervisor would have access to my desktop calendar as well as the one on the wall."  Payne Aff. ¶ 17.

In August 2006, Payne advised Human Resources Director Yvonne Heflin that she suffered from prenatal hypertension and that her doctor had advised her to work part-time at some point prior to her delivery.  Payne Aff. ¶ 21.  Heflin informed Payne that she did not yet meet the one-year requirement needed to be eligible for FMLA leave, but she asked Payne to submit a doctor's report for FMLA and short-term disability reasons.  Heflin Aff. ¶¶ 12-13; Payne Aff. ¶ 21.[3]  On

---

[3]Payne asserts in her statement of undisputed material facts that SSAC's position that Payne was ineligible for FMLA leave was an "erroneous assumption . . . in complete disregard of [Payne's] prior nine months of service with the SSAC, as part of a work study program."  Pl. Br.  3.  Working on this premise, Payne then asserts that she was disciplined for taking time off for FMLA-qualifying reasons. *Id.*  Payne has not supported with evidence or relevant legal authority this theory that time in an earlier work-study program with a different employer should count toward FMLA eligibility with SSAC.  Payne's assertions on these points are treated
(continued...)

August 16, 2006, Payne's doctor signed an FMLA certification form on Payne's behalf, stating that Payne suffered from prenatal hypertension and required more frequent visits for prenatal care, labs, and monitoring.  Payne Ex. D.  Payne's doctor stated that she was not incapacitated and would not be incapacitated unless her condition worsened or she developed preeclampsia.  Payne Ex. D.

Payne took time off on August 30, 2006 for prenatal care.  Payne believed she followed SSAC's process for pre-authorizing time off.  Payne Aff. ¶ 21.  On August 31, 2006, Payne received a "FINAL DISCIPLINARY WARNING" indicating that she had left early on August 30, 2006 without pre-authorizing time off. Payne Dep. Ex.14.  The August 31, 2006 Warning also advised Payne that another unauthorized leave of absence would "result in termination of your employment with the Twenty-First Century Scholars program."  Payne Dep. Ex. 14.  Knox agreed to allow Payne to take "unauthorized leave without pay" for medical appointments even though Payne had no sick, personal or vacation time remaining.  Heflin Aff. ¶ 17.  However, as part of this agreement, Payne was to bring in a doctor's note or receipt for each such absence.  Payne Dep. 33, Payne Dep. Ex. 9.  Payne believed she had remaining authorized time off available at this point, in spite of what Heflin told her.  Payne Dep. 37-38.

---

[3](...continued)
as unsupported legal arguments and not as facts.

Payne's father underwent surgery on Monday, September 11, 2006.  Payne Aff. ¶ 22.  Payne was permitted to take time off "to attend to" her father's surgery. When she requested the time off, Payne told Heflin that she believed that she would be able to return to work by noon.  Heflin Aff. ¶ 20.  The surgery took longer than Payne had anticipated.  She did not come to work on the 11th and did not call to request an extension of her time away from the office.  Payne Aff. ¶¶ 22-23; Heflin Aff. ¶ 21.[4]  On September 14, 2006, Payne stayed home with pregnancy complications.  Payne Dep. 54; Payne Aff. ¶¶ 24, 25; Heflin Aff. ¶ 22.  The parties dispute whether or not Payne informed Knox that she would be absent, but they agree that Payne did not provide a doctor's note regarding her absence on September 14, 2006.  Payne Aff. ¶¶ 24-25; Payne Dep. 54; Heflin Aff. ¶ 23.  When she returned on September 15, 2006, Payne was terminated for poor work performance and attendance.  Payne Aff. ¶ 4; Payne Dep. 50-51; Heflin Aff. ¶ 24. In contesting Payne's request for unemployment compensation, SSAC noted that Payne's reason given for her September 14, 2006 absence was "illness."  Payne Ex. F; Payne Aff. ¶ 9.

---

[4]The parties dispute when Payne returned to work.  Payne states that she returned at 8:30 the morning of September 12 and was told that she had vacation time available to cover her absence the day before.  Payne Aff. ¶ 23; Payne Ex. C. Heflin states that Payne did not return to the office until noon on the 12th.  Heflin Aff. ¶ 21.  Payne's time sheet reflects that she was granted vacation time for her absence on September 11 and 2.25 hours of leave without pay on September 12. Payne Ex. C.  Although these facts are disputed, the dispute is not material to the court's analysis of any of Payne's claims and need not be resolved here.

Payne claims that Dennis Obergfell and Bonnie Davis were SSAC employees who were not African-American or pregnant and who were treated better than she was. Pl. Ans. to Interrog. No. 19. Payne claims that Davis was allowed to miss work without negative repercussions. Payne Dep. 67-68. Davis was employed by SSAC for approximately eight to ten years as an Assistant Controller and missed work while on an approved leave. Heflin Aff. ¶¶ 26-27. Dennis Obergfell was employed by SSAC for more than five years as a Deputy Director and did not miss any work, although Payne believes that Obergfell was given a flexible schedule. Heflin Aff. ¶¶ 29-30; Payne Aff. ¶28.

*Discussion*

I. *The Eleventh Amendment*

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Amendment operates generally as a bar to actions for damages in federal court against states, state agencies, or state officials acting in their official capacities. See *Peirick v. IUPUI Athletics Dept.*, 510 F.3d 681, 694-95 (7th Cir. 2007); *Kroll v. Board of Trustees of University of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991) ("a state agency *is* the state for purposes of the eleventh amendment").

The bar is not absolute, however.  By exercise of its power under later amendments, including Section 5 of the Fourteenth Amendment, Congress may validly abrogate the states' sovereign immunity.[5]  The Supreme Court has held that Congress has not taken valid action to abrogate the Eleventh Amendment with respect to claims under Title I of the ADA, and the Seventh Circuit has reached the same conclusion under section 1981.  See *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 374 (2001) (states are immune from suits for damages under the ADA); *Burrus v. State Lottery Com'n of Indiana*, 546 F.3d 417, 423 (7th Cir. 2008) (holding that Indiana State Lottery was not a state agency and thus was not immune to race discrimination suit under section 1981).  Accordingly, a state agency may assert its Eleventh Amendment sovereign immunity to a private ADA or section 1981 claim for damages brought against it in federal court.  SSAC attempts to do so here.

In doing so, however, does SSAC attack the court's subject matter jurisdiction, raise an affirmative defense on the merits, or rely on a doctrine unto itself?  The Eleventh Amendment defense is unusual in that it may be waived, see

_____

[5]For example, Congress has abrogated state immunity to suit under Title VII, the family-care provision of the FMLA, the Rehabilitation Act, and Title VI and Title IX. See 42 U.S.C. § 2000d-7(a)(1) (abrogating state immunity for claims brought under Rehabilitation Act, Title VI, and Title IX);  *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 727-28 (2003) (finding that family-care provision of the FMLA validly abrogated sovereign immunity); *Nanda v. Board of Trustees of University of Illinois*, 303 F.3d 817, 831 (7th Cir. 2002) (finding that Congress validly abrogated immunity with respect to Title VII disparate treatment claims).  Regardless of its status as a state agency, SSAC is not immune  under the Eleventh Amendment from lawsuits seeking damages under these statutes.

*Lapides v. Bd. of Regents of Univ. System of Georgia*, 535 U.S. 613, 620 (2002) (holding that state waived Eleventh Amendment immunity by removing case to federal court), yet a court may raise the defense itself, see *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000).  If it is not raised by the state, a court may ignore the defense.  See *Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381, 391 (1998).  The essential characteristics of a defect in subject matter jurisdiction are that a court *must* raise the issue itself and that a party *may not* waive the defect.  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 95 (1998).  The Supreme Court has denied having reached any firm conclusion on the nature of the Eleventh Amendment defense, see *Schacht*, 524 U.S. at 391 ("a question we have not decided"), but the Seventh Circuit has recognized the clear implications of *Schacht*:  "the Eleventh Amendment does not deprive the federal court of its subject-matter jurisdiction."  *Higgins*, 217 F.3d at 953; see also *Lapides*, 535 U.S. at 620 (defense may be waived by conduct).

Ordinarily an esoteric question, here the issue could have some bite if the court were able to answer the seemingly simple question of whether SSAC is a state agency for purposes of the Eleventh Amendment.  To determine if a particular entity is an arm of the state, the court must look at two factors:  (1) the extent of the entity's financial autonomy from the state; and (2) the "general legal status" of the entity.  *Kashani v. Purdue University*, 813 F.2d 843, 845-47 (7th Cir. 1987).  Of the two, the entity's financial autonomy is the "most important factor."  *Peirick*, 510 F.3d at 695; see also *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

In evaluating that factor, the court considers the extent of state funding, the state's oversight and control of the entity's fiscal affairs, the entity's ability to raise funds independently, whether the state taxes the entity, and whether a judgment against the entity would result in the state increasing its appropriations to the entity. *Kashani*, 813 F.2d at 845; see also *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (recognizing "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations").

SSAC asserts that it is a state agency, but it has not presented any evidence or made any argument to support its conclusory assertion. See Def. Br. 9. Payne, in turn, relies on Indiana Code § 21-11-2-1 to support her argument that SSAC is not a state agency. That statute establishes the SSAC and provides that it is "a separate body corporate and politic" and "is not a state agency," but "performs essential governmental functions."

These provisions pertain to the SSAC's ability to borrow money without being subject to constitutional and other limits on the ability of the state government to borrow money. See, *e.g.*, *American Nat'l Bank and Trust Co. v. Indiana Dep't of Highways*, 439 N.E.2d 1129, 1132-35 (Ind. 1982); *Steup v. Indiana Housing Finance Authority*, 402 N.E.2d 1215, 1218-19 (Ind. 1980); *Orbison v. Welsh*, 179 N.E.2d 727, 738 (Ind. 1962); *Book v. Indiana Office Building Commission*, 149 N.E.2d 273, 281-82 (Ind. 1958); *Ennis v. Indiana Highway*

*Commission*, 108 N.E.2d 687, 693 (Ind. 1952).   These provisions do not necessarily answer the Eleventh Amendment question for SSAC.

Courts are cautioned against resolving questions of Eleventh Amendment immunity solely "by simple reference to Indiana statutory definitions." *Kashani*, 813 F.2d at 847.  When the Seventh Circuit recently considered this question with regard to the Indiana State Lottery, the court did not find the statute creating the lottery dispositive of the question of immunity.  See *Burrus*, 546 F.3d at 422-23. The statutory language there said that the lottery was "a separate body politic and corporate from state government and should function as much as possible as an entrepreneurial business enterprise."  The Seventh Circuit closely examined the record for evidence of the *Kashani* factors before concluding (consistent with the statute) that the lottery was indeed not an arm of the state and thus not entitled to Eleventh Amendment immunity.  *Burrus*, 546 F.3d at 422-23.

Here, the court cannot engage in analysis consistent with *Burrus*, for the parties have not brought forward evidence from which it might do so.  The court cannot conclude that SSAC is entitled to sovereign immunity under the Eleventh Amendment, a conclusion that is bolstered by but not based on Indiana Code § 21-11-2-1.  If Eleventh Amendment immunity were an issue of subject matter jurisdiction, the court would need to order further development of the record on these issues before the court could consider the merits of Payne's claims.  Because Eleventh Amendment immunity is not an issue of subject matter jurisdiction, the

court finds the issue is moot because none of Payne's claims, including her ADA and section 1981 claims (which otherwise would be subject to sovereign immunity, see *Garrett*, 531 U.S. at 368 (ADA); *Burrus*, 546 F.3d at 423 (section 1981)), can survive summary judgment on the merits.

II.     *Family and Medical Leave Act*

For any FMLA claim, eligibility is a threshold question.  The FMLA allows an *eligible* employee to take up to twelve weeks of unpaid leave during any twelve-month period if the employee is unable to perform the functions of her position on account of a serious health condition.  See *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 635 (7th Cir. 2009).  When an employee alleges that her employer interfered with her substantive rights under the FMLA, as Payne does here, she must establish that:  "(1) [she] was eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [she] was entitled to leave under the FMLA, (4) [she] provided sufficient notice of [her] intent to take leave, and (5) [her] employer denied [her] FMLA benefits to which [she] was entitled."  *Cracco*, 559 F.3d at 635-36, quoting *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).  The parties have filed cross-motions for summary judgment on Payne's FMLA claim turning on the question of whether or not Payne was eligible for FMLA leave.   The undisputed facts show that she was not.

"Eligible employee" is defined by the statute as "an employee who has been employed . . . for at least 12 months by the employer" and who has "at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).  With some limitations, the twelve month period need not be continuous, but employment periods prior to a break in service of seven years or more need not be counted in determining whether the employee was employed for at least 12 months.  See 29 C.F.R. § 825.110(b)(1) (with exceptions not relevant here).  The determination of whether an employee has worked for the employer for the requisite minimum of 12 months must be made as of the date the FMLA leave is to start.  29 C.F.R. § 825.110(d).

Payne began working for SSAC on September 19, 2005.  Payne Aff. ¶ 10; Heflin Aff. ¶ 4.  She would have been eligible for FMLA leave twelve months later, starting on September 18, 2006.  She was terminated three days earlier, on September 15, 2006.  Payne Aff. ¶ 4.  Payne was not eligible for FMLA leave when she was terminated, and her FMLA claim fails because she was not eligible for its benefits.

Payne attempts to circumvent her failure to satisfy the twelve-month requirement in two ways.  First, she argues that because she accepted SSAC's offer of employment in August 2005, her twelve month period started then.  Pl. Br. 9.  She offers no factual or legal support for this argument, which is contrary to the clear statutory language of the FMLA.

Payne also argues that she had been employed by the SSAC prior to September 19, 2005. Pl. Br. 9. The factual basis for this assertion is unclear, as Payne failed to support her assertion that she had any prior association with SSAC with competent evidence. Pl. Br. 9; see also Pl. Br. 3 (suggesting, in statement of "facts," that SSAC denied Payne FMLA time "in complete disregard of Plaintiff's prior nine months of service with the SSAC, as part of a work-study program"). Payne explains in her affidavit that her "prior nine months of service with the SSAC" was actually her receipt of work-study educational assistance while she worked at the Indiana University-Purdue University Indianapolis Ophthalmology Library nine years earlier, from August 1996 to May 1997. Payne Aff. ¶ 12. The relationship of Payne's work study in IUPUI's Ophthalmology Library to the SSAC is unclear, but there is no competent evidence in the record to support a finding that this was an *employment* relationship with the SSAC. Also, it is outside the seven year period allowed by 29 C.F.R. § 825.110(b)(1). Whatever Payne's prior service might have been, it does not contribute to the statutorily requisite twelve months that Payne must have worked for SSAC to have been eligible for FMLA leave. Payne was not eligible for FMLA benefits at the time of her termination. Accordingly, Payne's motion for summary judgment on her FMLA claim is denied and the defendants' motion is granted.

III.    *Americans with Disabilities Act and the Rehabilitation Act*

Payne claims that the defendants discriminated against her because of a disability and failed to accommodate her under the ADA and the Rehabilitation Act.  For her claims under these statutes to survive summary judgment, Payne first must offer evidence that she suffered from a disability.  29 U.S.C. § 793(d) (applying ADA standards to Rehabilitation Act claims); 42 U.S.C. §§ 12112(a), 12112(b)(5)(A) (discrimination and failure to accommodate under ADA); *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005) (first prong of a disability discrimination claim is showing of disability under the ADA); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (first prong of a failure to accommodate claim is showing that plaintiff was a qualified individual with a disability).  Payne has not offered evidence from which a reasonable jury could conclude that she was disabled, and her disability discrimination and failure to accommodate claims fail.[6]

An individual can prove that she is disabled by establishing that:  (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) she has a record of such an impairment, or (3) she is regarded as having such an impairment by her employer.   42 U.S.C. § 12102(1).

---

[6]The Rehabilitation Act prohibits any recipient of federal funds from discriminating against a qualified individual solely on the basis of her disability. The showing required to make out a *prima facie* case under the Rehabilitation Act differs from the showing required under the ADA only in that a Rehabilitation Act claim requires proof of federal financial assistance.  See *Silk v. City of Chicago,* 194 F.3d 788, 798 n. 6 (7th Cir.1999).  Payne does not attempt this showing, and her Rehabilitation Act claims also would not survive summary judgment on this basis.

"Substantially limits" means that a person is unable to perform a major life activity that the average person in the general population can perform or that the individual is significantly restricted as to the condition, manner, or duration under which she could perform a major life activity compared to an average person in the general population performing that same major life activity.   29 C.F.R. § 1630.2(j)(1)(i)-(ii).  In deciding whether a person is disabled, the fact finder must consider the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii); *Furnish v. SVI Systems, Inc.*, 270 F.3d 445, 451 (7th Cir. 2001).

Payne asserts that she was disabled because, while she was pregnant, she suffered the "physiological ramifications of pregnancy-induced hypertension, which hypertension, at the time it was diagnosed, had the potential to impact Plaintiff's reproductive health, not to mention the well-being of her soon-to-be-delivered child."  Pl. Br. 12.  She offers no evidence to support this claim, and for this reason alone her disability claims should fail.  See *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006) ("to survive summary judgment, a plaintiff must provide specific facts establishing that there is a general issue of material fact as to whether [she] is substantially limited in a major life activity . . . conclusory allegations will not do").   Assuming that Payne suffered from prenatal hypertension, her condition was temporary (lasting only as long as her pregnancy),

and she has not indicated that she suffered any long-term limitations as a result. She contends that her condition had the *potential* to limit her capacity for reproduction, but her ability to reproduce was not actually limited – let alone substantially limited – by her condition.   Payne has failed to show that she suffered from an impairment that substantially limited a major life activity.  Her ADA and Rehabilitation Act claims fail accordingly.

IV.    *Title VII and § 1981 Race Discrimination Claims*

Payne contends that the defendants' failure to grant her leave time and her termination were the results of illegal race discrimination in violation of 42 U.S.C. § 1981 and Title VII.  The analysis is essentially identical under both statutes. *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir. 2006); *Johnson v. City of Fort Wayne,* 91 F.3d 922, 940 (7th Cir. 1996).

A plaintiff in a Title VII or § 1981 case may proceed under either the direct or indirect methods of proof.  *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008) (section 1981); *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) (Title VII).  Here, Payne proceeds only under the direct method. Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption.  *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997).  The direct evidence must show that the defendant said or did something indicating discriminatory animus with regard to the specific employment decision in question.  *Rogers*, 320 F.3d at 753.  "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Illinois Dep't of Transportation*, 359 F.3d 498, 504 (7th Cir. 2004), quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).  "That

circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'"  *Id.*, quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Payne's entire race discrimination case is based on the following unsubstantiated assertion – that she was not provided leave and was terminated while two white employees, Davis and Obergfell, were provided with leave time or a flexible schedule and were not terminated.  Pl. Br. 14-15; see also Payne Aff. ¶¶ 27-28.  Payne offers no evidence in support of this assertion, and again, on this basis her race discrimination claims must be dismissed on summary judgment. See Fed. R. Civ. P. 56(e)(2) ("an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must . . . set out specific facts showing a genuine issue for trial").

Even if Payne had supported her contention with evidence, she would need to offer evidence that would allow a meaningful comparison of Davis' or Obergfell's treatment to hers.  Payne must offer evidence that Davis or Obergfell was "similarly situated" to her.[7]  In general, a person is similarly situated to a plaintiff

---

[7]This is true regardless of whether a plaintiff proceeds under the direct or the indirect method.  One recognized category of so-called "direct, circumstantial evidence" is that a similarly situated person not in the plaintiff's class was treated more favorably.  See *Troupe*, 20 F.3d at 736.  The fourth prong of the indirect method's prima facie case (not attempted by Payne here) is, likewise, that the plaintiff show that similarly situated employees who were not members of the plaintiff's protected class were treated more favorably.  See *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

if the two employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.  See *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007), citing *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002).  Payne has failed to offer evidence that Davis or Obergfell was subject to the same standards or engaged in similar conduct.  SSAC has offered undisputed evidence that Davis and Obergfell had been employed for many years, Davis' leave was approved, and Obergfell did not miss any work, whereas Payne had been employed for less than a year and had no leave time available.  Payne's race discrimination case fails.

V.       *Pregnancy Discrimination Claims*

Payne also contends that the defendants' failure to grant her leave time and her termination were the result of illegal sex discrimination in violation of the Pregnancy Discrimination Act.  It is unlawful for an employer to discriminate in the terms and conditions of employment because of an individual's sex, and "because of sex" includes pregnancy, childbirth, or related conditions.  42 U.S.C. §§ 2000e-2(a)(1), 2000e(k).  Women who are pregnant must be treated the same as unaffected individuals (female or male) for purposes of employment.

The court analyzes Payne's pregnancy discrimination claim as it would any other sex discrimination claim.  See *Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir. 2008) (explaining that the amendments to Title VII to include pregnancy did not create new rights or remedies and did not change the basic approach to a sex discrimination claim).  As with any other sex discrimination claim, Payne may prove her pregnancy discrimination claim through either the direct method or the indirect method, or a combination of the two.  *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007); *Troupe*, 20 F.3d at 736.  As with her race discrimination claim, Payne proceeds only under the direct method.  She asserts that she was treated worse than other individuals (Davis and Obergfell) who were not pregnant because, unlike them, Payne was not provided with medical leave upon request.  Pl. Br. 14.  As explained above, her unsubstantiated assertion is not sufficient to withstand the defendants' motion for summary judgment.  Payne also has failed to offer evidence that Davis or Obergfell was situated similarly to her.  Without such a showing, a jury could not infer that more favorable treatment of Davis or Obergfell was the result of illegal pregnancy discrimination.  Payne's pregnancy discrimination claims fail.

VI.     *Title VI and Title IX*

Title VI of the Civil Rights Act of 1964provides:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."   42 U.S.C. § 2000d.  Payne was an employee of the SSAC.  She has not shown that she was a participant in a program or activity receiving federal financial assistance.  Even if she had made a satisfactory showing that she was protected under Title VI, her claim fails, for she has failed to offer evidence that would suggest a finding that she was the victim of intentional race discrimination, as demonstrated above.  See *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (Title VI prohibits only intentional discrimination); *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 921-23 (7th Cir. 2007) (addressing plaintiff's claim that his removal from a master's program was illegal race discrimination using the direct and indirect methods of proof).

Title IX of the Education Amendments Act of 1972, as amended, states, in relevant part:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. § 1681(a).  Payne has not claimed to have been a participant in an education program or activity facilitated by SSAC and has failed

to offer evidence that SSAC receives federal financial assistance, which are both essential elements of a Title IX claim.  Even if her employment could be equated to participation in a federally-funded educational program or activity, she has failed to offer evidence of intentional sex discrimination.  Her Title IX claims fail accordingly.

VII.    *Section 1983*

Payne also brings a claim under 42 U.S.C. § 1983, which establishes liability for a "person" who deprives another of a constitutional right.  States, state agencies, and state officials when sued for damages in their official capacities are not "persons" for purposes of § 1983.  See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Williams v. Wisconsin*, 336 F.3d 576, 580 (7th Cir. 2003); *Illinois Ass'n of Mortgage Brokers v. Office of Banks and Real Estate*, 308 F.3d 762, 765 (7th Cir. 2002); *Sanville v. McCaughtry*, 266 F.3d 724, 732-33 (7th Cir. 2001). Payne has sued SSAC and Knox and Murphy only in their official capacities. Whether SSAC, Knox, and Murphy are "persons" under section 1983 need not be resolved here because Payne has no section 1983 claim on the merits.

"Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights conferred elsewhere."  *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997), citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979).  Accordingly, "the first step in any [§ 1983] claim is to identify the

specific constitutional right infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Payne has failed to do so. Even if she had specified the basis for her section 1983 claims, however, they would fail. To recover under section 1983, a plaintiff must demonstrate that she was deprived of a right secured by the Constitution or laws of the United States and that the persons depriving her of her rights acted under color of state law. *West v. Atkins*, 487 U.S. 42, 47 (1988). As discussed above, Payne has failed to offer evidence that she suffered deprivation of a constitutional right or that her rights under federal law were violated. Payne's section 1983 claims fail.

*Conclusion*

For the foregoing reasons, Payne's motion for summary judgment is denied, and the defendants' motion for summary judgment is granted. Final judgment will be entered accordingly.

So ordered.

Date: May 22, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Eric James Beaver
INDIANA OFFICE OF THE ATTORNEY GENERAL
eric.beaver@atg.in.gov, annika.brown@atg.in.gov, brenda.mahana@atg.in.gov

Laura Lee Bowker
OFFICE OF THE INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov,laurabowker@hotmail.com, Troyellen.Daniels@atg.in.gov,
Jeffrey.Hunt@atg.in.gov

James D. Masur, II
ROBERT W. YORK & ASSOCIATES
jmasur@york-law.com